**Affirmed and Memorandum Opinion filed June 4, 2015.**



In The

# Fourteenth Court of Appeals

### NO. 14-13-00677-CR

**LEE MENG TAING, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

### On Appeal from the 412th District Court
### Brazoria County, Texas
### Trial Court Cause No. 68424

## M E M O R A N D U M   O P I N I O N

Appellant, Lee Meng Taing, appeals his conviction for three counts of engaging in organized criminal activity.[1] He contends that his conviction rests on insufficient evidence and uncorroborated accomplice witness testimony. We affirm.

---

[1] *See* Tex. Penal Code Ann. § 71.02(a)(2) (Vernon Supp. 2014); Tex. Penal Code Ann. §§ 47.03(a)(1); 47.04; 47.06 (Vernon 2011).

BACKGROUND

The Brazoria County Sheriff's Office received information in September 2011 that appellant was running an eight-liner[2] gambling operation in six different game rooms throughout Brazoria County; based on this information, the sheriff's office began investigating and conducting surveillance of appellant and the six game rooms. About six months later, the six game rooms and the residences of appellant and his family were raided pursuant to a search warrant. Appellant was arrested during the raids and later charged with three counts of engaging in organized criminal activity based on gambling promotion (count one), keeping a gambling place (count two), and possession of a gambling device (count three). He also was charged with two counts of money laundering.

A week-long jury trial began on April 1, 2013, during which numerous witnesses testified. These witnesses included several police officers involved in the investigation, surveillance, and raids; several women who worked at the game rooms and were indicted for engaging in organized criminal activity; and appellant.

The jury first heard testimony from Sergeant James Brawner of the Brazoria County Sheriff's Office. He testified that he and several police officers under his leadership started investigating appellant in mid-September 2011, after Betty Stewart, a former employee of appellant, complained that illegal cash payouts were being made at various game rooms appellant owned. He testified that the investigation encompassed the following game rooms: "Lucky 777 Amusement" located at 2214 FM 523 in Oyster Creek, Brazoria County, Texas; "Keno Palace" located at 6618 Hwy. 332, Freeport, Brazoria County, Texas; "Keno Gone Wild"

---

[2] The eight-liners at the game rooms were electromechanical gaming machines that gave a player the opportunity to make bets or wagers and then win an item the value of which was "determined partially by chance."

2

located at 3711 SH 288B, Angleton, Brazoria County, Texas; "Deuces Wild" located at 500 W. Mulberry, Angleton, Brazoria County, Texas; "Lucky Horseshoe" located at 6805 Hwy. 36, Jones Creek, Brazoria County, Texas; and "Four Kings" located at 20722 Hwy. 35, Old Ocean, Brazoria County, Texas.

Sergeant Brawner testified that the investigation encompassed anyone associated with these six game rooms, including appellant's family: his wife Bridgette Taing, his mother Chhiv Churn, his father or stepfather Chhoeun Churn,[3] his sister Barbara Churn, and his brother-in-law Son Le. Sergeant Brawner testified that, as part of the investigation, he and his team of approximately 14 police investigators started conducting surveillance of appellant and his family members on September 15, 2011.

The police investigation team arrived at 5:30 a.m. at appellant's residence at 1619 Duncan Drive in Oyster Creek and started following appellant at 6:15 a.m. when he left his residence in a blue Hummer vehicle to drive to the Keno Gone Wild game room.[4] The police investigators observed appellant exit his vehicle and walk to the game room carrying a "black duffle bag" — "a sort of a briefcase shoulder carry bag." Appellant left the game room with his bag after approximately 45 minutes. Sergeant Brawner testified that appellant did not drive "in a normal fashion" as he left the game room, but drove instead in a manner consistent with a "heat run." Sergeant Brawner explained that a "heat run is an erratic driving behavior that is used by persons that are attempting to detect law enforcement surveillance or other persons following them. It consists of abrupt turns, making sudden lane changes and turns, not using turn signals or anything to

---

[3] It is unclear whether Chhoeun is appellant's father or stepfather.

[4] Because several game rooms changed names during the course of the investigation, we will for the sake of clarity refer to the game rooms by the names used at the time of the February 27, 2012 raids.

3

indicate which way a person may be driving." The investigation team abandoned surveillance of appellant after observing appellant's driving so he would not suspect that law enforcement was following him.

Sergeant Brawner and several police investigators conducted surveillance of appellant again on October 11, 2011. Sergeant Brawner testified that appellant drove from his residence in his Hummer vehicle to the Lucky 777 Amusement game room. He left the game room after a short time, "switched vehicles and left in a black Escalade, Cadillac." Appellant then drove to the Keno Gone Wild game room where he stayed a short time. Sergeant Brawner and the investigation team later discovered that appellant had switched vehicles again after leaving the game room. Sergeant Brawner testified that appellant's conduct in changing vehicles "twice in the same route" was significant because in Sergeant Brawner's "experience it's common that persons that are trying to elude law enforcement do that." Surveillance of appellant stopped when he returned to his residence later in the afternoon.

Sergeant Brawner testified that at some point during the day the investigation team had split in order to conduct surveillance of both appellant and his father Chhoeun. Surveillance of Chhoeun revealed that he also visited different game rooms; he was driving a silver Mercedes SUV and later switched to the black Escalade appellant had been driving. Chhoeun was observed at the Keno Gone Wild game room with a black duffle bag.

Sergeant Brawner testified that, at some point, police were allowed to install a mobile tracking device on appellant's Hummer and Escalade, and on Son Le's and Barbara's vehicles. Through the tracking device, the police investigators could observe the driving patterns of each vehicle. The investigation revealed that appellant drove regularly to the Lucky 777 Amusement, Keno Palace, and Keno

4

Gone Wild game rooms; drove on several occasions to the Deuces Wild game room; and drove once to the Lucky Horseshoe game room. Appellant's routine was to start driving to Keno Gone Wild, then travel south to Keno Palace, and then return to Lucky 777 Amusement.

Surveillance of appellant's sister Barbara and her husband Son Le showed that they regularly went to the Deuces Wild, Lucky Horseshoe, and Four Kings game rooms. Sergeant Brawner testified that Barbara and Son Le would leave their residence at 4106 Perry Drive in Pearland with a "black duffle style bag" — similar to the bag appellant carried — and then drive in one of their vehicles to various game rooms. "And on occasions after completing the run they would travel to Duncan Drive where [appellant] lives down in Oyster Creek." Sergeant Brawner testified that Barbara and Son Le would drive to "game rooms and display the same patterns that [appellant] would when he would go. They would be in a short way, 30 to 45 minutes, and they would carry a bag in, carry a bag out, depart the location and go on to the next one."

On one occasion, the investigation team followed Son Le as he was driving from the Deuces Wild game room to the Lucky Horseshoe game room carrying a black duffle bag, and one of the police investigators stopped Son Le for speeding. Son Le consented to the investigator searching his car during the traffic stop; the investigator found the "black bag [t]hat [Son Le] was seen carrying in and out of each of the game rooms" containing approximately $15,000 to $20,000 in cash as well as a pistol.

Sergeant Brawner also testified that he visited the Lucky 777 Amusement and Keno Palace game rooms several times as part of the investigation in an undercover capacity to play the eight-liners. He first went to the Lucky 777 Amusement game room on September 21, 2011, and, although he was told it was a

5

membership-only game room, he had no problem entering the game room because he "walked in with a group of people." Sergeant Brawner testified that right by the entrance "there was a sign-in sheet, like a ledger, a notebook, where they kept track of who was coming and going." Sergeant Brawner "followed the lead of the people ahead of [him], . . . signed in on the ledger using an alias name," was asked if he needed any change or a refreshment, and then chose one of the 30 to 40 machines to play a game. He chose an eight-liner video style machine; the machine recorded how much money he put in, subtracted wins, added up losses, and provided an "opportunity to win something of value." He "spent approximately $40, played a couple of different machines, and didn't receive a winning out of any of them." He also did not observe anyone else being paid cash during the time he was at the game room.

Sergeant Brawner testified that he visited the Lucky 777 Amusement game room again on September 28, 2011. He rang a doorbell because the door was locked; game room attendant Alicia McVey let him in because she seemed to recognize him from his previous visit. Upon entry, he was directed to a sign-in sheet and asked if he needed any refreshments or change. Sergeant Brawner started playing on a machine called Super Ball Keno; the machine recorded his wins and losses. He testified that "[o]n one play [he] placed a 1-dollar bet and accumulated $20 worth of credit," winning $19 on that one play. He later won $275 on a $1.25 bet, but he played the credits down to $100 to not raise any suspicions before "cashing out." Sergeant Brawner testified that in order to cash out he signaled to attendant McVey that he wanted to speak to her and told her that he wanted a ticket because he had observed other people say that in order to cash out; McVey then cleared out his credits on the eight-liner and paid him with a $100 bill for his win. Sergeant Brawner further testified that he observed McVey give

6

change to customers who needed it and also pay several customers cash for their winnings. He testified that the machines have "bells, whistles to signify any significant wins to kind of draw people's attention to the machines, kind of like in Las Vegas;" the machines would flash and make a noise on any significant win. After playing at two more "slot machine style" machines and not winning anything, he left the game room.

Sergeant Brawner returned one more time to the Lucky 777 Amusement game room in December 2011, and had no problem entering. When he entered the game room, attendant Amanda Cortez asked him if he wanted any change or refreshments and directed him to sign in; he explained that the purpose of signing in was to "keep track of the membership, who was coming and going and the times they were there." Sergeant Brawner chose to play a lottery style digital video game; the machine recorded his wins and losses but, in the end, he did not win anything during this visit. However, he observed other customers being paid cash for their winnings by Amanda Cortez.

Sergeant Brawner also visited the Keno Palace game room twice during the investigation. His first visit was on September 21, 2011; he parked in the parking lot and waited until a group of people arrived. He joined the group, walked in the game room, and was directed to sign in by attendant Rosalba Espinosa. At the time, he observed Chhoeun walking into the game room, meeting with Rosalba, giving her a "bundle of money," and Rosalba counting the bundle; Sergeant Brawner lost track of count after about $4,000 but it appeared that Chhoeun gave Rosalba a "significant amount of money." Sergeant Brawner decided to play on a video slot machine called Diamond Eyes; the machine recorded wins and losses. After putting $10 into the machine, Sergeant Brawner won $36.20, played his win down to $35, asked Rosalba for a ticket to cash out, and was paid $35 by Rosalba

after she checked the machine and cleared his credits. He moved on to play at a similar machine but did not win anything. He observed Rosalba pay a female customer $975 while he was at the game room.

On September 28, 2011, Sergeant Brawner went back to Keno Palace. He again walked in with a group of people, was directed to sign in, and was asked if he needed "any refreshments or change for playing." Rosalba and Kelly Winkworth were working at the game room that night. Sergeant Brawner testified that he started playing on a Las Vegas-style slot machine; the machine recorded wins and losses, but he did not win anything after spending $40 on it. He moved to a similar style machine and won $75 on a bet. He continued to play on the machine until his credits were $35. He then signaled the game room attendants, and Winkworth walked over and paid him $35 in cash for his winnings.

This concluded Sergeant Brawner's undercover investigation of Keno Palace. He attempted to enter the other four game rooms undercover but was denied access; he therefore had to use a confidential informant to continue the investigation of the Keno Gone Wild, Lucky Horseshoe, Deuces Wild, and Four Kings game rooms. The confidential informant had proven to be credible in past gambling investigations and entered the game rooms without problem; he appeared to be known by the attendants in the different game rooms.

On February 27, 2012, Sergeant Brawner and his team simultaneously raided the six game rooms; they also raided the residences of appellant and his wife, Chhoeun and Chhiv, and Barbara and Son Le. Several bank accounts were seized at this time. Police investigators seized $238,494.62 in cash as well as several cars, motorcycles, and other property during the raids. Sergeant Brawner testified that the police investigators seized $35,000 in cash from a blue safe in the residence of appellant and his wife; "[t]here was $6,897 found loose [lying] on the

floor in a closet. There was a larger safe found in the same closet that had $15,133 in it." Police investigators also seized numerous documents from appellant's residence. $91,706.05 and documents were seized from the residence of Barbara and Son Le. "[A] couple of handguns" and $10,752 in cash were seized from Chhoeun and Chhiv's residence. The remaining cash was seized from the six game rooms.

According to Sergeant Brawner, appellant was arrested on February 27, 2012, at the Deuces Wild game room where he was removing cash from the eight-liner machines. At the time of appellant's arrest, the police investigators found in appellant's Maserati "8-liner style keys to open the games," $29,618 in the black bag that appellant had been observed carrying in and out of the game rooms over the course of the investigation, and his Blackberry cell phone.

Sergeant Michael Willis, who was assigned to the Greater Houston Regional Computer Forensic Lab and whose duties included examining digital media from cell phones, testified at trial that he retrieved data from appellant's seized Blackberry cell phone. A redacted version of a printout containing the digital data from appellant's cell phone was admitted into evidence. The redacted version of the data Sergeant Willis retrieved contained text messages from appellant and several game room attendants. The text messages included instructions from appellant to attendants regarding what to do and how to operate the game rooms.

The jury also heard Investigator Brian Hoskins's testimony. Investigator Hoskins was assigned to investigate any illegal gambling activities at the Deuces Wild and Keno Gone Wild game rooms. Investigator Hoskins testified that he had to use a confidential informant in order to gain access to the Deuces Wild game room because he and other police officers had tried entering undercover "many times" but were refused entry because they were not known as customers at the

9

game room. Investigator Hoskins testified that he sent a confidential informant, who had provided police with credible information in previous gambling investigations, into the Deuces Wild game room on November 28, 2011, to "see if he or she could gamble." The confidential informant was wearing an audio recording device so that Investigator Hoskins could listen to what happened inside the Deuces Wild game room; the confidential informant had no problem entering the game room and received a cash payout after playing at the game room for about one hour. Investigator Hoskins sent the confidential informant to the Deuces Wild game room again on December 8, 2011, and January 23, 2012, and the informant again was paid cash after playing and winning on the eight-liner machines. Investigator Hoskins also testified that, while conducting surveillance, he saw appellant go several times — but "mainly on Monday mornings" — to Deuces Wild; he also saw appellant once at the Four Kings game room and several times at the Lucky Horseshoe game room.

Investigator Dustin Kreidler testified at trial that he started investigating the Four Kings game room through a confidential informant who had previously provided reliable information regarding gambling to police. Investigator Kreidler testified that the confidential informant wore an audio recording device, "enter[ed] the game room[] and play[ed] the 8-liner machines, the video gambling machines, and attempt[ed] to win and receive a cash payment." According to Investigator Kreidler, the informant went to the Four Kings game room on January 24, 2011, and January 31, 2011, entered without a problem, played both times the Keno Gone Wild game, and was paid cash after winning. Investigator Kreidler explained that he was not able to send an undercover officer into the Four Kings game room because "[y]ou have to be established in most of the game rooms prior to going in and playing. You have to be introduced by somebody that's already

10

played in them or you have to know somebody that's playing them to be introduced into the establishment." There was no police officer on the "team that was able to enter the Four Kings" game room.

The jury next heard testimony from Investigator Jimmy Miller, who was first assigned to follow appellant. He was later assigned to investigate the Lucky Horseshoe game room. Investigator Miller testified that he had to use a confidential informant wearing a recording device during his investigation of the Lucky Horseshoe; he could not send an undercover police officer into this game room because police investigators "had tried and they were turned away because they weren't members or weren't known by the attendant." The confidential informant was known at the game room and had no problem entering and playing. The informant played a game called Lucky Keno which is a type of a lottery game played with digital video balls. According to Investigator Miller, the informant gambled for approximately an hour and a half, won $40.80 on a $0.20 bet, played his winnings down to $35 on the eight-liner machine that recorded wins and losses, and had no problem cashing out his bet. Investigator Miller also testified that he saw appellant several times at the Lucky Horseshoe game room during his December 2011 to January 2012 surveillance of appellant.

Betty Stewart, who was a former game room attendant and manager, testified at length. She stated that she was first a customer at the Deuces Wild game room before appellant hired her as an attendant on November 17, 2009. As an attendant, she was making $10 per hour and her job duties included giving customers change as needed, making sure the customers were comfortable, and paying customers cash for their winnings or giving them playback cards depending on whether the customers were trustworthy. Stewart testified that appellant, his wife, his sister, and attendants at the different game rooms would tell her and other

11

attendants which customers they could pay in cash. Stewart testified that she was at first uncomfortable paying people in cash but she was told that, if she did not pay customers in cash, there would be no business. Stewart testified that appellant was her boss.

On August 6, 2010, Stewart opened the Lucky 777 Amusement[5] game room in her name and signed a lease agreement.[6] Stewart testified that appellant wanted her to file an assumed name certificate for the game room because he did not want "any business" to be in his name as "[i]t would bring the heat on and everybody would know that all the game rooms were connected." Stewart testified that she agreed to put the game room in her name for several reasons: she needed a job at the time; the game room she previously worked at had been closed after a raid; and she had been told that she "could run it the way [she] wanted to." Although she was supposed to tell everyone that Lucky 777 Amusement was her game room, it was "just a farce to make people think that [appellant] was not around" when in fact "it was all [appellant]." Stewart testified that even the lease she signed was a "dummy lease;" she "just had to sign it and have it posted on the wall in case [appellant] got raided and someone came in there." Although the lease agreement stated that the monthly rent was $1,800, Stewart never paid any rent to appellant or any of his family members nor did appellant attempt to collect any rent.

After she opened Lucky 777 Amusement, her job title changed from attendant to manager and she received a salary raise from $10 per hour to $500 per week plus $15 per hour for any time she worked over thirty hours; but she did not make any profit or receive any percentage of the money that was collected from

---

[5] On August 6, 2010, the game room was opened under the name "Lucky Spike" and thereafter changed names multiple times. *See also supra* note 4.

[6] Chhoeun was named as the landlord and Stewart was named the tenant in the lease agreement.

12

the game room machines. Stewart had no access to the machines and only appellant and the vendors had keys to the machines; some of the machines in the game room were owned by appellant and some by vendors. Stewart testified that appellant also owned machines in the other game rooms and that appellant and the vendors conducted weekly audits after which appellant would pay the vendors.

Stewart testified that, when she first opened Lucky 777 Amusement, she did not pay customers in cash but was soon told by appellant and his wife that she needed to pay cash or there would not be a business "because that's what the customers were coming for." Stewart acknowledged signing a "Notice to Employees & Acknowledgment," which stated that it was a crime to pay out cash for winnings and that any employee who paid customers in cash would be "terminated on the spot." Stewart stated that all employees were given this notice to sign because "[t]hat way if the police came in and raided this place that [appellant] would have someone to cover because the employee signed it stating they would be criminally charged for paying cash."

While Stewart was working at the Lucky 777 Amusement game room as well as the Deuces Wild, Keno Palace,[7] and Keno Gone Wild game rooms, she and the attendants were required to follow auditing and accounting rules to keep track of customers and payments. They also were required to keep up with records. The State introduced a stack of accounting and auditing sheets[8] that were seized from the game rooms, and Stewart confirmed that these were sheets that she and "each attendant had to fill out." Stewart testified that these accounting and auditing

---

[7] Stewart acknowledged also opening the Keno Palace (then called Keno Casa) game room and filing an assumed name certificate that she was doing business as a sole proprietor in May 2011, but she insisted that appellant paid for the certificate.

[8] *See infra* pp. 44-47 for examples of the numerous seized accounting and auditing sheets showing daily payouts for each game room machine, expenses, the amount and denominations of currency in the game room, cashouts, playback cards, etc.

13

sheets were true copies of the original sheets and that appellant would have the originals. Stewart explained how she and other attendants conducted the daily business at the game rooms, and the significance of the auditing and accounting sheets that Stewart also referred to as "daily reports":

[STEWART:] On each shift we had our own daily report. We started out. We counted the money, the playback cards, which is what we started with. And that's the very beginning. As the evening or the day progressed if we needed money we contacted [appellant]. Now all the other game rooms that I was in charge, they will contact me and I would contact [appellant] and he would send someone with money. We will write it on the form and have them sign it who delivered the money.

[THE STATE:] Okay. Why would you need — well, how much money did you start the day with or a shift with typically?

[STEWART:] Some days it was 2[,]500, 3,000, $4,000. It was all different.

[THE STATE:] Maybe if it was a weekend?

[STEWART:] Right. It depended on how much money was left there from the night before. That's how much we started out with the next day, and then [appellant] would come and re-up the money.

[THE STATE:] Okay. And did anyone else bring money to the game rooms?

[STEWART:] The whole family.

[THE STATE:] Okay. When you say whole family?

[STEWART:] His wife, his brother, his dad, his sister.

            *               *               *

[THE STATE:] Okay. That's fine. As a manager were you expected to keep some records?

[STEWART:] I kept those for my own because I did payroll.

[THE STATE:] Okay. You also did some payroll?

[STEWART:] Yes. And I did that for my own backup.

[THE STATE:] Well, how did payroll work?

14

[STEWART:] We paid by the hour. If [the attendants] were short in their money at the end of the day it was taken out of their check or their pay.

                    *                    *                    *

[THE STATE:] How would you know if a worker was short?

[STEWART:] Because whenever — during our shift the payouts were all listed on an audit sheet. And — well, it was a list that had all of our machines listed. Each payout was listed on each line that had the machine number.

[THE STATE:] So you could keep track of how much each machine paid out?

[STEWART:] Yes. And we knew what shift what worker was on to see if that cashout was actually there or not.

[THE STATE:] Okay. And so if a worker's sheet or end of day or end of shift balance didn't match or add up, what would happen?

[STEWART:] [Appellant] would have to go back and check the machines and see if the cashouts were there or not. Because if the cashouts weren't there then the attendant would be charged for a cashout that wasn't processed. But it was on the paperwork.

[THE STATE:] So each individual machine in the game room recorded how much cash had been paid out?

[STEWART:] And when.

Stewart also explained that the payouts listed on the daily report or accounting sheet had to match the payouts shown on the auditing sheet, which was a grid-like sheet listing payouts for each machine at the game room. The daily reports or accounting sheets also had labelled blanks for the amount of playback cards, the amount and denominations of currency at the game room at the end of a shift, expenses for supplies, food expenses, and the amount an attendant was "short." Stewart confirmed that all the game rooms she had worked at used the same accounting and auditing methods.

Stewart further testified that appellant required her and all attendants to give

him an exact money count for each game room via text message at least twice a day. She and the attendants also would contact appellant if they needed more money after a big payout or for other reasons. After texting him how much money was in the game room, "he would text back or someone would show up with the money." All of appellant's family members would deliver money to the game rooms, and appellant's wife and parents were frequently at the game rooms.

At trial, Stewart also identified a stack of time sheets that had been seized from some of the game rooms; she kept these time sheets and gave them to appellant together with any payroll paperwork. Appellant gave her money out of the machines to pay the attendants' salaries in cash. She testified that she and appellant both hired attendants, but appellant also told her whom she had to hire and whom she could not fire. Appellant specifically told her to hire his personal friend, Kelly Winkworth, and Diana Gonzalez because "she can bring in the customers;" he did not allow her to fire Gloria Corsentino. According to Stewart, appellant was her "boss" and she did not "answer to anyone else"; appellant controlled the game room and could fire her at any time.

Stewart testified that appellant fired her on or about August 28, 2011, after accusing her of stealing $2,400. She testified that she had closed the game room at night and the next morning she was first told that the game room had been robbed, but appellant later accused her of having stolen the money from him. Appellant never filed charges against Stewart but "[h]e had [her] go to the police department and make a police report." Stewart testified that "he told me that he would be there in a few minutes to look at the tape and it would show who the person is that came in. Three hours later when he showed up there was no tape."

During cross-examination, Stewart acknowledged that she was given immunity in exchange for her testimony at trial. Appellant's defense attorney also

inquired whether Stewart knew that appellant previously had been charged with gambling promotion and keeping a gambling place, and she confirmed that she knew appellant had been charged several times with gambling offenses. She stated that she remembered when all the game rooms had been raided but she did not know the outcome of the charges because she was never told. Appellant's attorney listed several charges that had either been dismissed or reduced to class C misdemeanors. Acknowledging that appellant had "run-in's with the law that ended in 2010," appellant's attorney asked Stewart if she "became an owner/operator" after these run-in's; Stewart responded, "Right."

The jury also heard testimony from former game room attendant and manager Maria Espinosa. She testified that she was first hired by Stewart in June 2011 to work as an attendant at the Lucky 777 Amusement game room. Her duties included to "attend people," give customers change, provide information about the machines in the game room, and give customers playback cards. She testified that she "answered to" Stewart and specifically to appellant. She testified that appellant and Stewart both showed her which customers to pay in cash, but that she only gave out playback cards that could be used at any of the machines in the game room while she worked at Lucky 777 Amusement.

Espinosa testified that appellant offered her a job as manager although she had never managed anything before. On September 1, 2011, she became manager of the Keno Palace game room and stayed as manager until the game room was raided in February 2012. When Espinosa became manager, she was required to make work schedules and handle payroll for the other game room attendants. Her salary increased from $8 per hour to $500 per week plus $10 per hour for any time she worked over thirty hours. Espinosa testified that appellant paid her salary but she never made any profit or received any percentage of the money that was

collected from the game room machines. She was not allowed to remove any money from the machines; in fact, the machines were always locked and only appellant had a key to them. As manager, she was also not allowed to fire anyone because "[t]he one that could really fire was" appellant.

Espinosa testified that, "as part of being a manager," appellant required her to put the game room in her name and file an assumed name certificate. Appellant also required her to sign a lease agreement, which she signed because she "needed a job," but she never paid "utilities, rent or anything like that." As manager, Espinosa also started paying customers in cash for their winnings. However, appellant questioned Espinosa why she did not pay certain customers in cash when she should "know who to pay and who not to" because some were good and longtime customers. On one occasion, appellant specifically called Espinosa to tell her about "a good customer" and instructed Espinosa to "treat her right," which meant appellant wanted Espinosa to pay that particular customer in cash.

According to Espinosa, appellant would visit Keno Palace "every day, every morning." At the game room, appellant would read the machines and verify if the payouts and cash on hand matched; he would also take money out of the machines. Appellant also required all customers to sign their names and the time and date they entered into a notebook so "he could know how many people were going in and what time." Espinosa also testified that during some shifts the game room needed additional cash if customers brought in more "big bills" but usually there was enough cash on hand for a larger payout. Appellant and Chhoeun would bring money to the game room as needed.

Espinosa further testified that approximately one month after the February 2012 raids, appellant called her and other attendants to attend a meeting in Surfside. Espinosa recalled that she, her daughter Rosalba Espinosa, Gloria

Corsentino, and appellant's wife were at the meeting in Surfside. There, appellant discussed the raids and "he explained that he couldn't help us, you know, with a lawyer or anything, that just to say what we had to say, that Ms. Betty [Stewart] was the one that hired us and trained us." Appellant was asking the attendants to "cover up for him" by saying that "we hardly didn't see him or he — no, he didn't have nothing to do with it. That he never told us to pay cash." Espinosa stated that none of the statements suggested by appellant were true, and she did not want to "cover up for him." She testified: "I didn't think it was, you know, fair. Just I'm saying what the truth [is] because I'm not going to be covering for nobody. I mean I paid cash. I paid cash. You know, I knew what I was doing. Which I needed a job so I started working there."

During cross-examination, Espinosa acknowledged that she was charged with engaging in criminal activity and was given immunity in exchange for her testimony at trial. She also acknowledged that she had fired one attendant while she was manager but insisted that appellant was the owner of the game rooms. Espinosa disagreed that appellant "got away" from all the "day-to-day details" and that she "took over" all the "day-to-day complications," "the employees, the money out of the machines, things like that" when she became manager of Keno Palace. She insisted that she only took over the attendants' work schedule and that appellant "would bring the money to pay the girls. [She] didn't have no money. He took out the money out of the machines. Not [her]. He would have the keys, not [she]." When Espinosa was asked if her bills and rent "got paid" with money out of the game room machines, she insisted that appellant's bills were being paid and not hers. And although she acknowledged that she had signed a lease agreement, she stated: "But he was the owner. I didn't get enough money to pay rent or anything." Finally, Espinosa was asked whether she failed to abide by the

19

"Notice to Employees and Acknowledgment telling [game room employees] not to pay gambling winnings" because Betty Stewart trained her that the only way to make money was to pay gambling winnings. Espinosa answered: "No. Betty told us that we supposed to pay cash because she was told by his — by the owner of the place, [appellant]."

Espinosa's daughter, Rosalba, who started working for appellant at the Keno Palace game room in November 2011, also testified at trial. As an attendant, Rosalba was "supposed to take care of the customers, ask them if they need any drinks, keep the place clean, if they need any change, do the drawings," and pay cash to people who won playing on the game room machines. Rosalba described the machines as electronic Las Vegas-style machines on which customers could place bets and the machines would record wins and losses. She testified that when customers wanted to cash out their winnings, she would have to record the cash out because appellant "would like to keep track of everything."

Rosalba testified that the lady who trained her told her to remember faces so she would know which customers to pay cash. Rosalba further testified that appellant would tell her who a good customer is or he "would send a customer and he would say she's one of the best customers, take care of her, or I know her," and Rosalba would pay in cash as instructed by appellant. Also, when Rosalba was unsure whom to pay in cash, she could always verify with appellant by texting him, and appellant would instruct her whom to pay in cash. She also testified that: "Whenever somebody like a new person would come by and they would tell me, well, [appellant] sent me, that's the time when I would call or I would text him. He would say that he was a good customer."

Rosalba acknowledged signing "a piece of paper that said that she was "agreeing not to pay cash," but she stated that she paid out cash anyway because

20

appellant had told her that the paper "was just something in case we get raided or anything, just, you know, like a pretending paper." According to Rosalba, appellant fired her in December 2011 because she was not paying enough customers in cash. She was rehired after her mother, Maria Espinosa, spoke to appellant. However, Rosalba had to apologize to appellant and say: "That I will keep on doing what he told me to do, like have everything. He wanted me to like keep on paying the people cash if I needed to. Keep up with my job."

Rosalba confirmed that appellant had a "pretty tight accounting system," was "pretty adamant about keeping accurate records," and "was very concerned to make sure that [the attendants] weren't stealing from him." No one at the game room had access to the money in the machines. Rosalba testified that appellant would visit the game room early in the mornings and "clear out the machines. In case somebody was short, he would go through it and check where was the money that we had paid cash. So he will pick up the money and then he would sign this paper that my mom — that he would make my mom shred it every time he would sign the paper and my mom would go through it and everything. That was the paper that it was showing who to pay cash and the playback cards to the people that we knew." Rosalba also confirmed that "if the numbers didn't match up between the amount of money you started with at the beginning of a shift and the amount of money that was paid out of the machine," appellant would subtract money from the attendants' salary.

Rosalba testified that if the attendants did not have enough money at the game room, they would have to text appellant to tell him the amount a customer won and also how much extra money they needed — "how many 5's, 20's." Appellant did not require any particular words, "just numbers." Rosalba testified that "for example, I would have — on 5's I would have a thousand. Like I would

put 5/1000 slash. And then I had — on 20's I had 2,000. I would be slash 20/2,000." After a text was sent to appellant, he or one of his parents brought money to the game room. Rosalba also testified that appellant required attendants to text him exactly how much money there was in the game room every time there was a shift change

Rosalba recalled that, when other game rooms in Brazoria County were raided before the February 27, 2012 raids, her mother became very worried. Rosalba testified that appellant told her mother not to worry; "he was laughing. He said in case anything happens, I got your back and I got your daughter's back. Which he never did." According to Rosalba, after the February 27, 2012 raids, appellant organized a meeting in Surfside at which appellant, his wife, his sister Barbara, appellant's attorney Mark Ebbits, Rosalba, Maria Espinosa, Alicia McVey, Gloria Corsentino, and attendant Herlinda Garcia were present. Rosalba described what happened at the Surfside meeting as follows:

> [THE STATE:] Okay. And what did the Defendant tell you?
>
> [ROSALBA:] He say we needed to have a talk to his lawyer, one of his lawyers.
>
> [THE STATE:] Okay.
>
> [ROSALBA:] And that — I was not even talking. All I know they were like having a conversation why all this happened. He had said that because Betty got caught with crack or something like that she gave us up so they can let her go to go against her.
>
> [THE STATE:] Okay.
>
> [ROSALBA:] And we were just having the conversation and pretty much he didn't help us out at all. He didn't say nothing like money-wise like — he didn't bond us out. He didn't do nothing. He knew we were going through the rough time. So he didn't do nothing. All he did just have a conversation with his lawyer to ask him what was going to happen. His lawyer said him to drop to a misdemeanor if we go against Betty pretty much. That's all he said.

22

*            *            *

[THE STATE:] . . . Did he tell you to not involve him in this case?

[ROSALBA:] Pretty much.

[THE STATE:] Okay.

[ROSALBA:] He said that.

[THE STATE:] Did he try to tell you what to say?

[ROSALBA:] Yes.

[THE STATE:] Specifically what was that?

[ROSALBA:] It was saying that to not — to not say that he was the one who will tell us to pay cash. It was Ms. Betty.

[THE STATE:] Okay. And that's true?

[ROSALBA:] Well, when I got hired I was not working by Ms. Betty. Ms. Betty have told my mom, Maria. Ms. Betty, you know, showed but she was working under [appellant]'s condition. Like Lee told her who to pay and stuff like that. She had worked for him for years so —

[THE STATE:] Okay. But as far as what the Defendant was telling you to say?

[ROSALBA:] It was go against Betty.

[THE STATE:] Okay. And to not involve him in any way?

[ROSALBA:] In any way.

[THE STATE:] Okay. But you knew that wasn't true?

[ROSALBA:] It wasn't true.

During cross-examination, Rosalba acknowledged giving a statement at the District Attorney's Office that Betty Stewart had trained her. Rosalba testified that her statement was not correct because Stewart had trained her mother Maria Espinosa — not Rosalba. Rosalba also acknowledged calling the police on a customer, after which appellant "got mad" and told her mother to fire her because "he didn't like those kind of problems" at the game room. Rosalba stated that appellant rehired her after she apologized. Rosalba also testified that she gave her

23

statement to explain that appellant did not tell the truth when he said the game room attendants decided to pay customers in cash.

Former game room manager Diana Gonzalez also testified at trial. Appellant had hired her in June 2011[9] to be the manager of the Keno Gone Wild game room. She returned to work in September after taking time off to care for her sister; her duties as manager included keeping the game room clean, hiring attendants, making work schedules, and doing payroll. Gonzalez testified that she put the game room in her name and filed an assumed name certificate, but she did not sign a lease agreement when she was hired as manager.

Gonzalez testified that appellant was her boss at the game room. He would come to the game room in the mornings, do an audit and pick up money from the machines, check how much money was put in the machines and how much each machine paid out, and, if he noticed a shortage, require the attendants to pay for the shortage from their salary. Gonzalez testified that, although appellant's mother would come to deliver supplies and appellant's father would come to repair things at the game room, appellant was the only one who had access to the machines. She also testified that she was required to notify appellant by text how much money was needed at the game room and how much money was still at the game room before she could leave for the day.

Gonzalez quit her job at the Keno Gone Wild game room on January 12, 2012,[10] because she did not get along with appellant and did not want to open

---

[9] Although Gonzalez was unsure if she was hired June 2010 or 2011, the assumed name certificate Gonzalez filed is dated June 2011, and she was required to file the certificate to be a manager.

[10] Although Gonzalez testified that she quit her job at the game room on January 12, 2011, the assumed name certificate Gonzalez had filed was dated June 11, 2011, and she would not have filed it after she quit her job. Further, the "Notice of Abandonment of Assumed Name" she filed was signed January 25, 2012, and Gonzalez testified that she had filed the notice after

another game room for him and put it in her name. Gonzalez filed a Notice of Abandonment of Assumed Name for the Keno Gone Wild game room.

During cross-examination, Gonzalez acknowledged that she was charged with engaging in organized criminal activity and was given immunity for her testimony at appellant's trial. When asked by appellant's attorney if she was the "owner/operator" of the Keno Gone Wild game room for which she filed an assumed name certificate, Gonzalez denied being the owner/operator and stated that she was "just running" the game room and was "just a manager." Gonzalez insisted "[t]hat wasn't [her] game room."

The last former game room attendant who testified at trial was Kelly Winkworth. She was hired to work at the Keno Palace game room and was trained by Stewart, who was terminated about two weeks after Winkworth started working at the game room. She testified that her duties as an attendant included giving customers change, drinks, snacks, and playback cards, and paying customers in cash for their winnings. Winkworth testified that she paid cash to regular customers but only gave out playback cards to people who were not known at the game room. According to Winkworth, appellant never told her whom to pay in cash. And, in the two to three months she worked at the game room, she only saw appellant once or twice during her morning shift. Appellant would "work on machines and empty out machines." Winkworth testified that, in the time she worked at the game room, she saw appellant's dad "[o]nce or twice bring food and things like that but that was it."

The State also introduced various exhibits at trial that were seized by police investigators during the raids or were recovered thereafter, including (1) accounting and auditing documents seized from the different game rooms; (2) sign-

quitting her job.

25

in sheets and notebooks containing names, dates, and times for game room customers; (3) membership books containing photos of more than 250 game room members seized from the game rooms; (4) accounting and auditing documents seized from file cabinets at appellant's residence; (5) documents relating to a bank account appellant opened as sole proprietor of one of the game rooms on June 7, 2011; (6) bank statements addressed to appellant and the game room for the bank account opened by appellant on June 7, 2011; (7) assumed name certificates for the different game rooms signed at various times by appellant, Barbara, Chhoeun, Stewart, Espinosa, Gonzalez, and Corsentino; and (8) police reports appellant filed regarding break-ins that allegedly occurred at the Lucky 777 Amusement game room.

After the State rested its case, the defense called appellant's former attorney, Douglas Colvin, to testify. Colvin testified that he met appellant several years earlier when appellant came to his law office seeking advice regarding "civil business related matters, business formation." Appellant also came to Colvin "about a gaming room"; appellant explained "his ideas and what he wanted to do and [Colvin] told him and warned him about here are things that you really need to take care of and here are some acknowledgements. Although ignorance is no excuse of the law, you really need to make sure your employees know certain things they can and cannot do."

Colvin testified that appellant at the time had opened one or two game rooms and managed them. Colvin discussed with appellant the "legitimate use" of eight-liners; discussed the law regarding the payment of cash for winnings and "that there were no bets to be paid;" drafted the Notice to Employees and Acknowledgment for appellant to give to his employees to sign; and advised appellant to display the document "in plain sight around the entire game rooms."

Colvin also testified that appellant sought his advice at least three times regarding "how to help people set up their own operation with him just owning the building."

Colvin further testified that he represented appellant after he had been charged in June 2010 with six different gambling offenses. Colvin stated that four of the charged offenses were dismissed and appellant pleaded no contest to two offenses.[11] After appellant was convicted of gambling offenses in January 2011, Colvin "on a couple occasions" gave appellant "advice about how game rooms could be operated legally," but not as extensively as before. Colvin acknowledged that it is "quite possible" that appellant "could have interest in six different games room and [Colvin] not have any idea which ones he owns, operates, invests in or leases out."

Finally, appellant took the stand and testified at length. Appellant testified that sometime in 2007 he had lunch with a friend who told appellant that he had eight-liners in storage and asked appellant if he wanted to open a game room. After doing "some research on how it all worked," appellant opened his first game room with "about 38 machines" called Lucky 777. According to appellant, he first "sought legal counsel to talk about how [he was] supposed to be doing this business" after he became aware that his employees were paying cash to customers. Appellant testified he "confronted the issue," but as much as he stressed to his employees "how it all works, you can't control what they do." Appellant claimed that, when he was "running" his game room, he terminated people for "paying a bet."

Appellant testified that he consulted an attorney only after his game room

---

[11] Certified copies of trial court judgments admitted at trial establish that appellant was, in fact, convicted of three gambling offenses in January 2011; three, not four, of the charged offenses were dismissed.

was raided in late 2010. As a result of the raid, six charges for gambling offenses were filed against appellant, and he hired attorney Colvin. Appellant met with Colvin to seek advice regarding how he could operate game rooms and "this type of business without getting into, you know, the trouble that I am in now." Colvin then drafted the "Notice to Employees and Acknowledgment"; appellant testified that, when he was running his game rooms, he had his employees sign the document Colvin drafted and he advised his employees "that not only was it against the law but they would be terminated if [he] ever caught them" paying cash.

Appellant claimed that, after he "went through the ringer with those misdemeanor charges," he decided he no longer wanted to operate the four game rooms he had. All he wanted to do is read his machines and "get a small percentage out of that," but he did not want to deal with the daily tasks of operating the game rooms. The opportunity to get out of operating the game rooms arose first when Betty Stewart approached him and wanted to rent his Keno Gone Wild[12] game room. Appellant testified that he leased the game room to Stewart and suggested that "she get an assumed name to do it the right way" and also have employees sign the Notice to Employees and Acknowledgment document Colvin had drafted. Appellant testified that he gave this document to all the other game room operators who leased premises from him; he also suggested that they file an assumed name certificate.

Appellant testified that, in early 2011 he started using a new business model under which appellant leased the buildings to game room operators; had the new operators sign a lease agreement; and "suggest[ed] they get an assumed name certificate to open [a] bank account because that's what you need to open a bank

_____

[12] Appellant testified that the game room was called Jackpot at the time.

28

account is a D/B/A." He lent cash when the new operators needed it and maintained the game room machines. According to appellant, 60 percent of the machines' proceeds went to the operators to pay rent, utilities and their employees, and 40 percent went to him. Appellant testified that he used this business model with Stewart, Espinosa, and Gonzalez. Appellant described this arrangement as "a win-win situation for them that if they did not make enough to cover their expense I would guarantee them at least $500 out of — I would absorb that as a vend[o]r." Appellant guaranteed the operators a minimum weekly income of $500 because he "want[ed] to be fair."

Appellant explained that the 60/40 split from the machine proceeds was determined by a daily reading of the eight-liners and verified by audit sheets. Appellant admitted that he owned some of the game room eight-liners and others were leased to purchase. He also acknowledged that he "handle[d] the currency coming out of the machine[s]" and that he went to the game rooms to empty the machines and conduct an audit daily or every three days depending on the location. Appellant claimed that the operators were "very savvy regarding the accounting." Appellant also explained that, when someone texted him "we need money," this meant that "they need money" to operate the game room. Appellant explained that the purpose of having cash delivered to the game rooms, whether by him, his wife, or his parents, was to operate the game rooms.

Appellant testified that he and Stewart "parted ways" sometime in July 2011. He claimed that Stewart was "the biggest mistake" because he rented three of his game rooms to her and "six months into her operation [he] found out that she was using the building that [he] had rented to her to operate a drug business. She hired her dealer." He claimed he told Stewart to leave his buildings but he felt threatened by Stewart because she had family in law enforcement. Appellant

29

further claimed that Maria Espinosa approached him about going into business with him after she learned about his "falling out" with Stewart; appellant stated that he asked Espinosa if she could take over Stewart's lease at the Keno Palace game room and later at the Lucky 777 Amusement game room.

Appellant also explained that he had a daily routine of going to the game rooms for about one hour to ensure the machines were working; read the machines; and do his paperwork. Although he made "suggestion[s] on how to properly run the place or machines," gave advice to the operators, and referred employees, appellant said he never told any game room attendant or operator to pay winnings in cash. He said Stewart trained all of the witnesses who testified at trial that he told them to pay cash. He testified that he always instructed everyone to pay customers playback cards; in support, he pointed to one of his text messages containing these words: "Yes. Do. Not pay them. Cards only."

Appellant acknowledged having a meeting at Surfside which was attended by his former attorney, Mark Ebbits, his wife, his sister Barbara and her husband Son Le as well as Maria Espinosa, Rosalba Espinosa, and Kelly Winkworth. Appellant testified that "[t]he purpose of the meeting was to, you know, to help understand, you know, where I am at this point, you know, and what they are charged with, what I am charged with, and that they should seek attorney [sic] them self [sic]." According to appellant, the women "looked like they were on vacation" and no one "act[ed] as if they were upset or mad."

During cross-examination, appellant acknowledged starting his business model for the operation of his game rooms in early 2011 "shortly after [he] entered a plea with the State in [his] prior gambling charges." He admitted opening a bank account at Texas Dow Credit Union for one of his game rooms on June 7, 2011 — a date after he implemented his business model. Appellant denied "opening

30

gambling places" and making money off attendants paying out cash to customers; instead, he stated that he only "rents" machines and does not know what operators do. He also denied taking money out of attendants' pay if they were short at the end of a shift; he claimed the operators made the deductions.

Appellant denied calling any of the women who worked at the game rooms his employees. However, he admitted filing police reports about alleged break-ins at the Lucky 777 Amusement game room in August and October 2011, in which he claimed to be the "sole owner of the business and all valuables in the safe." Appellant explained his statement in the police reports by saying that he meant he was the owner of "the building, the machines, the safe."

Appellant admitted telling game room operators to text him if they needed cash; he testified that he would "just open the machine and read the machine and leave" them cash. Appellant testified that he does not recall asking operators for updates but admitted that he sent text messages from his cell phone, stating: "New update time please [g]et cash update to me no later than 4:30pm, 8pm, and 5am every day." Appellant claimed he was involved in the game rooms only as a vendor. He testified that he "subtracted" lease payments on a weekly basis but had no records showing the payments. Appellant later contradicted himself and testified that he had "records of lease payments being made by" operators but that Sergeant Brawner took the records.

When the State showed appellant accounting and auditing sheets police investigators had seized from his residence during the February 2012 raid, appellant claimed that he did not recognize any of the documents and did not know how they got in his house. He testified that police may have "misplaced" or "planted" the documents at his house. Appellant testified that it "seems like" the police investigators were "out to get" him because of "the fallout with Betty

31

Stewart and she has people behind her that are . . . in law enforcement." Appellant also testified that he is being "persecuted" because Brazoria County and the Sheriff's Department would benefit from obtaining his money.

After deliberation, the jury found appellant guilty on three counts of engaging in organized criminal activity; the jury found appellant not guilty of two counts of money laundering. The trial court signed a judgment of acquittal on the two counts of money laundering. The trial court sentenced appellant to 180 days confinement in state jail as to count one of engaging in organized criminal activity; the court further sentenced appellant to two years' confinement in state jail probated for five years and a $10,000 fine as to counts two and three of engaging in organized criminal activity. Appellant timely filed an appeal.

## ANALYSIS

Appellant states in his first issue that the evidence is "insufficient to support a conviction for any of the counts of organized criminal activity." Beyond this statement, however, appellant does not make any argument relating to this first issue. In addition to failing to present any argument in his brief regarding his first stated issue, appellant also conceded during oral argument that the evidence is sufficient to support his conviction for engaging in organized criminal activity as to counts one and two if accomplice witness testimony is considered. Appellant argues in his second issue that his conviction impermissibly rests on uncorroborated accomplice witness testimony.

We overrule appellant's first issue and proceed to his second issue.[13]

---

[13] The State acknowledged in its brief that Betty Stewart, Maria and Rosalba Espinosa, Diana Gonzalez, and Kelly Winkworth were accomplice witnesses. The jury charge includes an instruction regarding accomplice witness testimony.

## I.   Standard of Review and Applicable Law

A conviction cannot be secured upon the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant to the offense.  *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006). Article 38.14 of the Code of Criminal Procedure, entitled "Testimony of Accomplice" and commonly known as the accomplice witness rule, provides as follows:  "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."  Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005); *Cerna v. State*, 441 S.W.3d 860, 864 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). In analyzing a challenge to the sufficiency of corroborative evidence, we view the evidence in the light most favorable to the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008).

To evaluate the sufficiency of corroboration evidence, we must eliminate all accomplice testimony from consideration and examine the remaining portions of the record to see if any evidence tends to connect the accused with the commission of the crime.  *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007).  The corroborating evidence need not be sufficient by itself to establish guilt; there need only be other evidence tending to connect the defendant to the offense.  *Id*. Testimony of an accomplice need be corroborated only as to facts "'tending to connect the defendant with the offense committed and not as to the corpus delicti itself.'"  *Id*. (quoting *Gribble v. State*, 808 S.W.2d 65, 71 n.13 (Tex. Crim. App. 1990)).

The non-accomplice evidence need not link appellant directly to the crime or establish guilt beyond a reasonable doubt.  *Id*.; *McDuff v. State*, 939 S.W.2d 607,

613 (Tex. Crim. App. 1997). And the accomplice testimony need not be corroborated on every element of the offense. *Griffin v. State*, 936 S.W.2d 353, 357 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd). "There must simply be *some* non-accomplice evidence which *tends* to connect appellant to the commission of the offense alleged in the indictment." *Castillo*, 221 S.W.3d at 691 (emphasis in original).

When there are two permissible views of the evidence, one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense, appellate courts should defer to that view of the evidence chosen by the factfinder. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). The issue is not how an appellate court independently would assess the non-accomplice evidence, but whether a rational factfinder could conclude that the non-accomplice evidence tends to connect the accused to the offense. *Id*. at 509. Direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

Each case must be judged on its own facts, and there is no set amount of non-accomplice corroboration evidence that is required. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Id*. But the presence of a defendant at the scene of a crime, by itself, is insufficient to corroborate accomplice testimony. *Id*. Therefore, we "consider the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense."

34

*Smith*, 332 S.W.3d at 442.

Appellant was indicted on three counts of engaging in organized criminal activity based on gambling promotion (count one), keeping a gambling place (count two), and possession of a gambling device (count three).

The jury was instructed to determine whether appellant, "as alleged in the indictment, with intent to establish, maintain or participate in a combination, or in the profits of a combination, did . . . either acting alone or as a party"[14] commit the following acts: (1) intentionally or knowingly operate or participate in the earnings of a gambling place by giving out cash at the Lucky 777 Amusement, Keno Palace, Keno Gone Wild, Deuces Wild, Lucky Horseshoe, or Four Kings game rooms (count one); (2) "knowingly use a building as a gambling place, to wit: the Lucky 777 Amusement," Keno Palace, Keno Gone Wild, Deuces Wild, Lucky Horseshoe, or Four Kings game rooms, "and said property was under the control of the defendant" (count two); or (3) "with intent to further gambling knowingly possess a gambling device that the defendant knew was designed for gambling purposes, which included video gaming devices, cash, cards, receipts and records of payments" (count three).

A person commits the offense of engaging in organized criminal activity if, with the intent to establish, maintain, or participate in a combination or the profits of a combination, he commits or conspires to commit one of several enumerated offenses, including any gambling offense punishable as a Class A misdemeanor. Tex. Penal Code Ann. § 71.02(a)(2) (Vernon Supp. 2014). "Combination" means three or more persons who collaborate in carrying on criminal activities. *Id*. §

---

[14] The jury charge included an instruction on the law of parties: "A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *See* Tex. Penal Code Ann. § 7.02(a)(2) (Vernon 2011).

71.01(a)(Vernon 2011). There are two parts to the mental state requirement in engaging in organized criminal activity. *Hart v. State*, 89 S.W.3d 61, 63 (Tex. Crim. App. 2002). One mental state requirement in section 71.02(a) is that the defendant must intend to establish, maintain, participate in, or participate in the profits of a combination. *Id*. The other "mental state requirement is included in the commission of one of the enumerated [underlying] offenses." *Id*.

A person commits the Class A misdemeanor offense of gambling promotion if he intentionally or knowingly operates or participates in the earnings of a gambling place. Tex. Penal Code Ann. § 47.03(a)(1)(d) (Vernon 2011). "Gambling Place" means any real estate, building, room, tent, vehicle, boat, or other property whatsoever, one of the uses of which is the making or settling of bets. *Id*. § 47.01(3) (Vernon 2011). "Bet" means any agreement to win or lose something of value solely or partially by chance. *Id*. § 47.01(1) (Vernon 2001).

A person commits the Class A misdemeanor offense of keeping a gambling place if "he knowingly uses or permits another to use as a gambling place any real estate, building, room, tent, vehicle, boat, or other property whatsoever owned by him or under his control, or rents or lets any such property with a view or expectation that it be so used." *Id*. § 47.04(a) (Vernon 2011).

A person commits the Class A misdemeanor offense of possession of a gambling device "if, with the intent to further gambling, he knowingly owns, manufactures, transfers, or possesses any gambling device that he knows is designed for gambling purposes." *Id*. § 47.06(a) (Vernon 2011). "Gambling device" means any electronic, electromechanical, or mechanical contrivance that for a consideration affords the player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the

36

contrivance. *Id*. § 47.01(4) (Vernon 2011). The term includes, but is not limited to, gambling device versions of bingo, keno, blackjack, lottery, roulette, video poker, or similar electronic, electromechanical, or mechanical games that operate by chance or partially so, that as a result of the play or operation of the game award credits or free games, and that record the number of free games or credits so awarded and the cancellation or removal of the free games or credits. *Id*. § 47.01(4)(A).

## II.     Sufficiency of Corroborating Evidence

On appeal, appellant challenges only the sufficiency of corroborating evidence with regard to the commission of the three underlying gambling offenses; appellant does not challenge the sufficiency of corroborating evidence regarding whether he committed the underlying gambling offenses "with the intent to establish, maintain, or participate in a combination or in the profits of a combination." Therefore, we analyze whether the accomplice witness testimony at trial was sufficiently corroborated with respect to the underlying gambling offenses.

Appellant contends that, although the accomplice witnesses "admitted to gambling offenses and to 'paying off bets' in the game rooms," there is no non-accomplice evidence that appellant (1) "participated in the management of the gamerooms;" (2) "authorized the payment of wagers;" (3) "knew anything about paying winning wagers or engaging in gambling activity;" and (4) was connected to "paying off on a wager, or to promoting gambling, or to maintaining a place for gambling" or "any unlawful activities at the gamerooms."

Appellant contends that he maintained the game rooms and the machines but did not manage the day-to-day operations in the game rooms. He argues that operators independently ran the different game rooms and controlled the business

37

operations and employees at each location.

Contrary to appellant's contentions, we conclude there is ample corroborating evidence tending to connect appellant to the commission of the underlying gambling offenses of gambling promotion, keeping a gambling place, and possession of a gambling device to support his conviction for all three counts of engaging in organized criminal activity.

The jury heard testimony from Sergeant Brawner that he visited the Lucky 777 Amusement and Keno Palace game rooms several times and was paid cash for winnings after gambling on eight-liners. During his visits to the game rooms, he also observed several other game room customers receive cash payments for their winnings. Sergeant Brawner, Investigator Hoskins, Investigator Kreidler, and Investigator Miller also testified that a confidential informant visited the other four game rooms, gambled on the eight-liners, and was paid cash for winning his bets on the eight-liners. This evidence corroborates accomplice testimony that customers regularly were paid cash for their winnings at all the game rooms.

Appellant testified that he no longer wanted to deal with the daily tasks of operating his game rooms after he was convicted in January 2011 of three gambling offenses; he therefore implemented a new business model under which he would have other individuals operate the game rooms and he would be a landlord and be in charge of the game room machines. Non-accomplice evidence showed that appellant spent a considerable amount of time visiting different game rooms on a daily basis; his involvement in the game rooms went far beyond that of a mere landlord who leased the game rooms and read machines for a small percentage of the machine intake.

Appellant acknowledged he had a daily routine of going to the game rooms for about an hour to take care of the machines, read the machines, conduct an

audit, and do his paperwork. He admitted giving the operators advice and "suggestion[s] on how to properly run the place or machines," and referring employees. Appellant also admitted "suggesting" to Stewart that she file an assumed name certificate for a game room. Appellant admitted that he would regularly provide the operators with large amounts of cash so they could operate the game rooms. He stated that he was responsible for the machines in the game rooms; never disputed that he was the only one with access to the machines; and admitted that he owned or leased the machines. He admitted telling attendants to pay customers playback cards and vouchers for their winnings, but he could not "recall" if he was ever asked about paying customers cash.

Sergeant Brawner's testimony confirmed that surveillance of appellant showed that he followed a routine in visiting different game rooms on a daily basis, staying at the game rooms for a period of time, and delivering cash to and removing cash from the game rooms in a black bag. Through tracking devices, investigators further detected appellant's and his family members' driving pattern as they visited the different game rooms daily.

Text messages found on appellant's cell phone corroborate accomplice testimony that appellant was the owner of the game rooms, controlled them, and was actively involved in every aspect of their operation. The messages confirm that appellant

- wanted to know how many customers were at the game rooms at times: "How many peeps so far?" and "They r packed tonight. 18 people";

- required attendants to provide daily updates on how much money was at the game rooms at certain times of the day: "New update time please Get cash update to me no later than 4:30pm, 8pm, and 5am

39

every day";

- required attendants to contact him via text with the amount and denominations of currency in the game rooms: "1000/20 n 600/5 n 5 ppl in kp" and "900 in 5[']s & 3000 in 20[']s . . .";

- required that attendants pay for any shortages after accounting and auditing: "Did ms put money back for shortages";

- decided, as an employer, who could work at the game rooms: "Sorry I said I wasn't gonna text or call u but I really do miss what I was doing[,] is it to[o] late to ask for my job back, if it is it's ok I understand & please don't tell everyone I was begging!!!";

- determined which attendants could work at particular game rooms: "Call mandy and tell her to start monday at 8am in danbury" and "Gloria text u bout being at krazy 8s at 10am?";

- gave instructions regarding employees: "Maybe tell her she need to get pw right or you have no choice but to let her go";

- authorized raises for employees: "Give missy 50 cents rasied [sic]"; and

- decided on whether to admit new game room members: "Tell her to see Gloria bout membership" or "I wouldn't take any more members."

Text messages confirmed accomplice testimony that appellant specifically instructed attendants to pay cash to customers: "Older white lady with brithish [sic] accent is a good customer. She live down the road. Take good care of her." Text messages also corroborated testimony that attendants could check with appellant regarding which customers to pay in cash versus playback cards: "Yes.

40

Do. Not pay them. Cards only."

A stack of accounting and auditing sheets seized from the game rooms and appellant's residence[15] also corroborates the accomplice testimony. These documents confirm descriptions of the specific and rigid system appellant required everyone to follow in order to document payouts for each game room machine, expenses, the amount and denominations of currency present in the game room, playback cards, and cashouts. The notebooks and sign-in sheets seized from the game rooms further confirm that appellant required attendants to keep track of customers because he wanted to be informed about how many customers were at the game rooms at specific times.

Appellant claimed that all of the "operators" approached him to lease his game rooms and operate under his business model. But he admitted that, after the fallout with Betty Stewart, he "asked" Maria Espinosa "if she can take over Betty's lease" for the Keno Palace game room in August 2011 and later for the Lucky 777 Amusement game room. Appellant testified he was "recruiting Maria" to become an operator.

Additional corroborating evidence was presented to the jury at trial in the form of police reports appellant filed in August and October 2011 regarding alleged break-ins at the Lucky 777 Amusement game room. In the two reports, appellant stated that he was the "owner of the premises and valuable[s]" and that he was the "sole owner of the business and the valuable[s]." Although it is somewhat unclear when exactly appellant fired Stewart in August 2011, according to appellant, Espinosa had taken over Stewart's lease as the new operator/owner of the Lucky 777 Amusement game room by October 2011; yet, appellant stated in

---

[15] The different accounting and auditing sheets seized from the game rooms and from appellant's residence are nearly identical.

the October police report that he was the "sole owner of the business."

Appellant also admitted to opening a bank account at Texas Dow Credit Union as the owner of one of the game rooms on June 7, 2011. This event occurred after appellant claimed he had implemented his new business plan in February 2011. Under this new plan, appellant contended that he functioned as a landlord who leased game rooms to others to operate/own and only shared in game room machine profits. The jury was shown bank statements for this Texas Dow Credit Union account; these statements were sent to appellant at the game room address at which, according to appellant, Stewart was operating the Lucky 777 Amusement game room as an operator/owner of the game room.

Further evidence tending to connect appellant to the underlying gambling offenses was Sergeant Brawner's testimony that surveillance showed appellant conducting a "heat run," meaning appellant was driving erratically after leaving a game room to either detect police surveillance or to elude police. The police investigation team also observed appellant switching cars during his visits to different game rooms, which according to testimony is a common practice of people who are trying to elude law enforcement.

After eliminating the accomplice testimony from consideration and then examining the remaining portions of the record, we conclude that the record contains ample evidence linking appellant in some way to the commission of the charged underlying gambling offenses and showing that rational jurors could conclude that this evidence sufficiently tends to connect appellant to the gambling offenses. Under the applicable standard, we conclude non-accomplice evidence tends to connect appellant with the commission of engaging in organized criminal activity based on gambling promotion (count one), keeping a gambling place (count two), and possession of a gambling device (count three). We overrule

appellant's second issue.

## CONCLUSION

We affirm the trial court's judgments.

/s/    William J. Boyce
          Justice

Panel consists of Justices Boyce, Jamison and Donovan.
Do Not Publish — TEX. R. APP. P. 47.2(b).

INT _CR_

DATE: 7/10/11

OVER _____
SHORT _____
ROLLOVER $_____/_____
FOR OFFICE USE ONLY

2925
CASH- IN $ _1225_  CASH-OUT _1965_ = _960_
(Starting Cash)      (Ending Cash)    (Total Cash Used)

CARD-IN $ _2585_  CARD-OUT$ _1720_ = _865_
(Starting Cards)    (Ending Good Cards)  (Total Cash Outs)

## BAD CARDS
$ _900_

| COINS - _____ | | |
|---|---|---|
| $1s _____ | | |
| $5s _1485_ | | |
| $10s _10_ | | |
| $20s _420_ | | |
| $50s _50_ | | |
| $100s _____ | | |
| TOTAL $ _1965_ | | |

### DRAWINGS
| Time | | Ppl | Amt |
|---|---|---|---|
| ( ) | | ( )( ) | |
| ( ) | | ( )( ) | |
| ( ) | | ( )( ) | |
| ( ) | | ( )( ) | |
| ( ) | | ( )( ) | |
| ( ) | | ( )( ) | |
| ( ) | | ( )( ) | |

FREEPLAY : _50_

EXPENSE: _____
_____

FOOD: _____

PAY-OUT: _865_
Total Cash-outs

### LOANS
L.7
$ _1700_  SIGNATURE _____
$ _____  SIGNATURE _____
$ _____  SIGNATURE _____
$ _____  SIGNATURE _____

CSH - 196...
CRDS - 262...
(DL)

### Daily Chores
KEEP FOOD AREA CLEAN AT ALL TIMES
KEEP ALL SNACKS, DRINKS, ETC STOCKED AT Al
KEEP MACHINES WIPED DOWN & FREE OF TI
CHANGE TRASH BAGS AS NEEDED
MAKE SURE BOTH RESTROOMS HAVE TISSUE/PAPER TOWELS & GA

Cash = _1225_ CR
1525

Cards
2585

INT _JL_

DATE: _7_ / _10_ / _11_

3365

4465

CASH- IN $ _1905_ (Starting Cash)  CASH-OUT _3355_ (Ending Cash)  = _1110_  1100 (Total Cash Used)

CARD-IN $ _2020_ (Starting Cards)  CARD-OUT$ _2230_ (Ending Good Cards)  = _390_ (Total Cash Outs)

**BAD CARDS**  -30

$ _930_

| COINS - ___ | | DRAWINGS | | | | |
|---|---|---|---|---|---|---|
| $1s _5.00_ | | **Time** | | | **Ppl** | **Amt** |
| $5s _1810.00_ 1785 | | ( ) | | | ( )( ) |
| $10s _1440.00_ | | ( ) | | | ( )( ) |
| $20s _1440.00_ ✓ | | ( ) | | | ( )( ) |
| $50s _100.00_ ✓ | | ( ) | | | ( )( ) |
| $100s ___ | | ( ) | | | ( )( ) |
| TOTAL $ _3355_ 3375 | | ( ) | | | ( )( ) |
| | | ( ) | | | ( )( ) |

FREEPLAY : _50.00_

EXPENSE: _clock out_

FOOD: _460_

PAY-OUT: _390.00_

Total Cash-outs

**LOANS**

$ _2500_  BF  SIGNATURE _____

$ _____  SIGNATURE _____

$ _____  SIGNATURE _____

$ _____  SIGNATURE _____

3365
3160

3265

**Daily Chores**

KEEP FOOD AREA CLEAN AT ALL TIMES

KEEP ALL SNACKS, DRINKS, ETC STOCKED AT ALL TIMES

KEEP MACHINES WIPED DOWN & FREE OF TRASH

CHANGE TRASH BAGS AS NEEDED

MAKE SURE BOTH RESTROOMS HAVE TISSUE/PAPER TOWELS & GARBAGE EMPTIED AS NEEDED

3R — 865
DL- 390.⁰⁰

Date: 7-10-11

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| 30 | 20 | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| 25 | 5 | | | | | | | | | | | | | | | | | |
| 30 | 45 | 45 | 5 | 25 | 10 | 15 | 10 | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| 70 | 0 | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |

| 31 | | | |
|----|----|----|----|
| 32 | | | |
| 33 | 120 | 640 | |
| 34 | 5 | | |
| 35 | 10 | | |
| 36 | | | |
| 37 | | | |
| 38 | | | |
| 39 | 10 | 20 | |
| 40 | | | |
| 41 | | | |
| 42 | | | |
| 43 | 5 | | |
| 44 | | | |
| 45 | | | |
| 46 | | | |
| 47 | | | |
| 48 | | | |
| 49 | | | |
| 50 | | | |
| 51 | 5 | | |